☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 25-913M(NJ) |
| THE RESIDENCE LOCATED AT S41W26893 OAK GROVE LANE, WAUKESHA, WISCONSIN 53189 | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ____5/30/2025____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      ____5/16/2025 @ 10:34 a.m.____          *Judge's signature*

City and state:      ____Milwaukee, WI____          Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to be Searched**

The property to be searched is the premises, safes, and garage located at **S41W26893 Oak Grove Lane, Waukesha, Wisconsin 53189** (the SUBJECT PREMISES). The premises is a two-story single-family residence located on the east side of the intersection of River Road and Oak Grove Lane in Waukesha Wisconsin. The residence is gray or light blue with red shutters. The front door is located on the southwest side of the residence facing River Road. A two-car garage is located on the Northwest side of the residence with a driveway that opens onto Oak Grove Lane. At the end of the driveway is a mailbox labeled with "S41W26893 Oak Grove Lane". An above-ground swimming pool is located on the southeast side of the residence.



**ATTACHMENT B**

**Information to be seized by the Government**

       1.      The items, information, and data to be seized from the location[s] described in Attachment A are fruits, evidence, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1343: Wire Fraud, 18 U.S.C. § 1956-1957: Money Laundering, and 18 U.S.C. § 371 (or U.S.C. § 1349): Conspiracy, as described in the search warrant affidavit, including, but not limited to:

      a.   Records and information related to a financial fraud, cryptocurrency investment fraud or "pig butchering" scheme;

      b.   Records or information related to the purchase, sale, possession, use, transfer, or exchange of cryptocurrencies, or the location, address, balance of any cryptocurrency assets or accounts;

      c.   Passwords, private keys, or seed phrases associated with any cryptocurrency assets;

      d.   Cryptocurrency wallets, to include digital wallets, cold storage wallets, paper wallets, or any other form of storing public and/or private keys associated with cryptocurrency assets;

      e.   Records or information related to the creation or use of cryptocurrency accounts, wallets, or addresses;

      f.   All documents listed financial transactions, communications, names, account numbers phone numbers, or other personal identifiers;

      g.   Records and information related to the existence and/or operations of Eureka Private Equity or any other business owned or operated by Michael Jon Archimede;

      h.   Records and information related to the identity or location of potential victims, witnesses, co-conspirators, or suspects involved in financial fraud schemes;

      i.   Records and information related to communications with victims, potential victims, co-conspirators, and/or potential co-conspirators of financial fraud schemes;

      j.   Records and information related to communications with legitimate cryptocurrency exchanges or other cryptocurrency companies;

      k.   Records and information related to the Michael Jon Archimede's taxes, finances, and/or any movement of funds, to include data, records, images, documents, programs, applications, or materials tending to show the use of bank accounts, credit card accounts, or other financial accounts;

      l.   Personal checks, cashier's checks, deposit slips, check stubs, wire transfer forms, promissory notes, or any other documents demonstrating a transfer of funds from victims or potential victims to Michael Jon Archimede or from Michael Jon Archimede to co-conspirators or potential co-conspirators involved in financial fraud schemes;

m. Records and information related to any administrative, civil, or criminal proceeding initiated by or against Michael Jon Archimede, to include any proceedings initiated by regulatory bodies such as the Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any state agencies;

n. Evidence indicating Michael Jon Archimede's state of mind, or that of any potential co-conspirator, as it relates to the crime under investigation;

o. Digital devices or storage mediums used as a means to commit the violations described above, to include but not be limited to, a Samsung Galaxy A50 with device name "Mike's Galaxy A50", any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to the creation of investor statements of account, the management of investor funds, or accessing cryptocurrency assets;

p. For any digital device or storage medium whose seizure is otherwise authorized by this warrant, and any digital device or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Digital Device"), in addition to the items described in paragraphs a-o, above, the following items will be searched for and seized from these Digital Devices:

   i. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to financial fraud schemes;

   ii. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any money or funds obtained from any individuals or entities;

   iii. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any efforts to obtain money or funds from any individuals or entities;

   iv. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any financial transactions, transfers, or deposits of funds, cryptocurrency, or purchases of assets or cryptocurrencies;

   v. Evidence of who used, owned, or controlled the Digital Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   vi. Evidence of software that would allow others to control the Digital Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   vii. Evidence of the lack of such malicious software;

   viii. Evidence indicating how and when the Digital Device was accessed or used to determine the chronological context of Digital Device access, use, and events relating to crime under investigation and to the Digital Device user;

   ix. Evidence indicating the Digital Device user's state of mind as it relates to the crime under investigation;

x. Evidence of the attachment to the Digital Device of other storage devices or similar containers for electronic evidence;

xi. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Digital Device;

xii. Evidence of the times the Digital Device was used;

xiii. Passwords, encryption keys, and other access devices that may be necessary to access the Digital Device;

xiv. Documentation and manuals that may be necessary to access the Digital Device or to conduct a forensic examination of the Digital Device;

xv. Records of or information about Internet Protocol addresses used by the Digital Device;

xvi. Records of or information about the Digital Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xvii. Contextual information necessary to understand the evidence described in this attachment.

2. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of digital device or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3. The term "digital device" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6. During the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) from Michael Jon Archimede at the time of the execution of the warrant, if necessary, to unlock any devices requiring such biometric

access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the devices, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

      a.   Any of the devices found at the Subject Premises or on the person of Michael Jon Archimede;

      b.   Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

7. While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any devices or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Devices, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 25-913M(NJ) |
| THE RESIDENCE LOCATED AT S41W26893 OAK GROVE LANE, WAUKESHA, WISCONSIN 53189 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see Attachment A,

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. §§ 1956-57 | Money Laundering |

The application is based on these facts:
Please see attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Blair Diel, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 5/16/2025

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE MATTER OF THE SEARCH OF:

THE RESIDENCE LOCATED AT
S41W26893 OAK GROVE LANE,
WAUKESHA, WISCONSIN 53189

Case No.   25-913M(NJ)

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

1.      I, Blair Diel, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of **Michael Jon ARCHIMEDE** located at **S41W26893 Oak Grove Lane, Waukesha, Wisconsin 53189** (the **Subject Premises**).

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the FBI's Springfield Field Office. I have been a Special Agent with the FBI since May 2018.  Upon joining the FBI, I received basic law enforcement training at the Federal Bureau of Investigation Academy in Quantico, VA, to include interviewing and interrogation techniques, conducting surveillance, conducting arrests, conducting searches and seizures.  I have experience with cases involving the following crimes: aggravated identity theft, conspiracy, financial crimes, internet fraud, mail fraud, money laundering, and wire fraud. I also have experience utilizing the following investigative techniques and procedures: interviewing suspects, victims, and witnesses; reviewing financial records; collecting and examining digital evidence; conducting surveillance; applying for and executing search and seizure warrants; and conducting arrests.

### PURPOSE OF AFFIDAVIT

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956-1957 (Money Laundering), and 18 U.S.C. §§ 371 or 1349 (Conspiracy), (hereinafter the "Target Offenses") have been committed, are being committed, and/or will be committed by **Michael Jon ARCHIMEDE** and other persons as yet

1

unknown. There is also probable cause to search the location described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

5. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part. The following is true to the best of my knowledge and belief.

**PROBABLE CAUSE**

6. Since November 2024, I have been investigating allegations of a cryptocurrency investment fraud perpetrated by **Michael Jon ARCHIMEDE** (hereinafter "ARCHIMEDE"). During the course of this investigation, I have learned ARCHIMEDE was a financial representative associated with Primerica Financial Services, Inc. (Primerica) from in or around August 2008 to January 10, 2024, and, in such a capacity, ARCHIMEDE provided retirement and investment products to his clients and was responsible for managing approximately $10 million of client assets. Since his termination from Primerica in January 2024, ARCHIMEDE has held himself out as being self-employed through a business called "Eureka Private Equity."

7. There is probable cause to believe ARCHIMEDE used his position of trust with over 30 of his Primerica clients to convince them to withdraw a total of at least $1.2 million from their respective investment and/or retirement accounts at Primerica and send those funds to ARCHIMEDE in a capacity outside of his association with Primerica. Furthermore, there is probable cause to believe ARCHIMEDE converted the client funds he received into cryptocurrencies, which he then transmitted

2

to currently unidentified parties in furtherance of what appears to be a cryptocurrency investment fraud scheme. This is sometimes referred to as a "pig butchering" scam. Based on my investigation, there is probable cause that ARCHIMEDE has been participating in investment fraud schemes as recently as April 2025.

8.    Based on my training, experience, and investigation of ARCHIMEDE to date, as outlined below, there is probable cause to believe that evidence, instrumentalities, contraband, fruits of the crime, or things otherwise criminally possessed currently exist at ARCHIMEDE's residence, the Subject Premises. Specifically, I believe there is likely evidence of ARCHIMEDE's involvement in various fraudulent schemes, included the cryptocurrency investment fraud scheme described above and in the paragraphs that follow. Such evidence may include the following: client lists and client investment documents, communications with co-conspirators or victims, contact information of co-conspirators or victims, records of financial accounts or transactions made between accounts, financial instruments, personally identifiable information of victims, and computers or cellular devices used by ARCHIMEDE to communicate with co-conspirators, victims, and in furtherance of the fraudulent scheme. Many of these documents, communications, and other items are likely stored electronically on computers or other devices.

**ARCHIMEDE Resides at the Subject Premises**

9.    Based upon my review of bank records, police reports, and Department of Motor Vehicle (DMV) records, I learned each of these records list ARCHIMEDE's home address as the Subject Premises. Furthermore, publicly available property records for Waukesha County, Wisconsin indicate that for the Tax Year 2025, ARCHIMEDE and his spouse are the listed owners of the Subject Premises. Publicly available real estate tools indicate the last transaction involving the Subject Premises occurred on June 21, 2005.

**ARCHIMEDE's Employment at Primerica as a Financial Advisor**

10.    From approximately August 2008 through January 10, 2024, ARCHIMEDE was employed as a financial representative at Primerica—a financial services company that employs independent contractor financial representatives.

3

11. Based upon my review of documents provided by the Financial Industry Regulatory Authority (FINRA), I learned ARCHIMEDE was registered as an Investment Company and Variable Contracts Products Representative with the Financial Industry Regulatory Authority (FINRA) from January 2010 to in or around January 2024. Based upon my review of records provided by FINRA, I learned ARCHIMEDE did not disclose participation in any outside business activities to Primerica.

12. Based upon my review of documents provided to FINRA by Primerica, I learned ARCHIMEDE was responsible for between $9 million and $10.5 million of assets under management (AUM) between December 2021 and November 2023.

13. ARCHIMEDE was notified via a letter from Primerica on November 16, 2023, that ARCHIMEDE was being placed on an administrative suspension effective November 15, 2023, due to a complaint filed with Primerica by LS—a client of Primerica and ARCHIMEDE. In the letter, Primerica instructed ARCHIMEDE to "refrain from any action that we or any agent, witness or potential witness could view as harassment, obstruction or interference with the fact-finding process… In particular, do not contact witnesses or potential witnesses to attempt to influence what they may say about the matter or to otherwise influence the inquiry…."

14. On December 6, 2023, Primerica filed an amendment to ARCHIMEDE's Uniform Application for Securities Industry Registration or Transfer (Form U4) disclosing that the firm had received a written customer complaint alleging that ARCHIMEDE had borrowed funds from a customer in violation of Primerica rules and procedures. On December 21, 2023, Primerica filed a Form U5 terminating ARCHIMEDE's registrations with Primerica. On January 10, 2024, Primerica filed an amended Form U5 disclosing that ARCHIMEDE had been permitted to resign during an internal review after ARCHIMEDE admitted to borrowing money from a customer.

**ARCHIMEDE Barred by FINRA**

15. As of April 14, 2025, ARCHIMEDE's status with FINRA was listed as "Barred" on FINRA's "Broker Check" website, meaning FINRA has permanently prohibited ARCHIMEDE from associating with any FINRA member in any capacity (e.g. Primerica). However, based upon my review of records provided by FINRA, I learned that ARCHIMEDE was subject to FINRA's jurisdiction under

4

FINRA By-Laws while ARCHIMEDE was employed at Primerica until he was barred on or about January 22, 2024.

16. Based upon my review of FINRA records, I learned that FINRA conducted a regulatory investigation into ARCHIMEDE's activities based on disclosures filed by Primerica. On December 21, 2023, pursuant to its investigation, FINRA sent requests to ARCHIMEDE for the production of information and records and documents and to appear for on-the-record testimony pursuant to FINRA Rule 8210. ARCHIMEDE refused to provide the requested records and documents and to appear for on-the-record testimony. ARCHIMEDE's refusal constituted a violation of FINRA Rule 8210(a)(1), and ARCHIMEDE ultimately consented to disbarment by FINRA from associating with any FINRA member in all capacities.

17. On January 17, 2024, ARCHIMEDE signed Letter of Acceptance, Waiver, and Consent No. 2023080714501, accepting and consenting to the violations of FINRA Rule 8210(a)(1) and ARCHIMEDE's disbarment from associating with any FINRA members.

**Review of ARCHIMEDE's Personal Bank Accounts**

18. Based upon my review of personal bank accounts held by ARCHIMEDE and his spouse, I learned that from at least June 14, 2022 to August 15, 2024, over 30 individuals—several of whom I have reason to believe were ARCHIMEDE's clients at Primerica—transferred a total of at least $1.2 million to ARCHIMEDE via wire transfers, cashier's checks, personal checks, peer to peer transfers, and/or cash. I observed that each time funds were received in ARCHIMEDE's bank accounts, similar amounts were quickly transferred to accounts at Crypto.com, Coinbase.com, and/or Kraken. Based upon my training and experience, I know Crypto.com, Coinbase.com, and Kraken to be cryptocurrency exchanges, or publicly accessible websites where users can create accounts to convert amounts of fiat currency (such as USD) into various supported cryptocurrencies, such as Bitcoin (BTC), Ether (ETH), Tether (USDT) or USD Coin (USDC).

19. Based upon my review of ARCHIMEDE's Crypto.com and Coinbase.com account records, I observed that the client funds were transferred in fiat from ARCHIMEDE's personal bank accounts to cryptocurrency exchange accounts held in ARCHIMEDE's name. Shortly after the funds

5

were received in ARCHIMEDE's cryptocurrency exchange accounts, the funds were converted from U.S. Dollars to cryptocurrencies and subsequently transferred to a small number of privately held cryptocurrency wallet addresses. As of the date of this affidavit, I have not been able to identify the owners of the receiving wallet addresses.

20. It should be noted that I observed instances where the amounts ARCHIMEDE received from individuals exceeded the amount that he subsequently transferred to the cryptocurrency exchanges. Based upon this observation, I have reason to believe ARCHIMEDE failed to convert the full amount of the victim funds into cryptocurrencies and personally benefited from some of the transactions to some degree.

**ARCHIMEDE Received $52,000 from LS in August 2023**

21. Based upon my review of an email sent to Primerica by LS, I learned that LS was one of ARCHIMEDE's Primerica clients. LS had known ARCHIMEDE for over 20 years, and ARCHIMEDE had been LS' financial representative for more than 10 years. In the email to Primerica, LS alleged that ARCHIMEDE contacted LS at the end of 2022 and requested that LS invest $30,000 in a cryptocurrency investment, but LS declined.

22. According to LS' email, ARCHIMEDE contacted LS again on August 15, 2023, and told LS that ARCHIMEDE needed to borrow $52,000 from LS' Primerica account for a very short period of time because ARCHIMEDE had a "glitch" in his personal finances. ARCHIMEDE told LS he could get the money back in 3 days' time. ARCHIMEDE told LS that Primerica could not know about ARCHIMEDE's request. LS told ARCHIMEDE that LS was uncomfortable with the request and the potential tax penalties that could be incurred due to a withdrawal from her account. Eventually, LS acquiesced and agreed to let ARCHIMEDE use $25,000 from LS' Primerica account with the condition that ARCHIMEDE would return the funds by the following week. According to LS, ARCHIMEDE guaranteed he would return the funds by the following week and assured LS that the money would be back in her account before a tax penalty was incurred.

23. On August 16, 2023, ARCHIMEDE initiated a withdrawal of $52,000 from LS' Primerica account. On August 16, 2023, the same day of the withdrawal, LS spoke with ARCHIMEDE

6

via telephone and confronted him because he had initiated a withdrawal of $52,000 instead of the agreed-upon $25,000. ARCHIMEDE responded by assuring LS that ARCHIMEDE would return the funds the following week. The withdrawn funds were then deposited in LS' personal banking account.

24. On August 18, 2023, ARCHIMEDE contacted LS requesting that LS send ARCHIMEDE the money. According to LS, ARCHIMEDE told LS that he needed the money on that day because he needed the money to clear his bank by August 21, 2023.

25. On or about August 18, 2023, ARCHIMEDE traveled to LS' residence in his personal vehicle, picked up LS, drove LS to a bank, and directed LS to purchase a cashier's check payable to ARCHIMEDE for $52,000, and LS complied. At the time this occurred, LS was over the age of 60.

26. Based upon my review of ARCHIMEDE's personal bank records, I learned on August 18, 2023, ARCHIMEDE deposited a Citizens Bank cashier's check for $52,000 into his account at Wells Fargo. The remitter listed on the cashier's check was LS. On August 21, 2023, ARCHIMEDE transferred $52,500 from his Wells Fargo bank account to his account at Crypto.com. I reviewed records for ARCHIMEDE's Crypto.com account and observed that on the same day, ARCHIMEDE used his Crypto.com account to convert the funds to 51,548 USDT, a cryptocurrency, and then transferred the USDT to wallet address 0x4Fd973226EBF34cbdAfC2e943496D13Ae3762d84.

27. On August 22, 2023, ARCHIMEDE sent LS a text message stating "Things did not go as planned but still trying to get it worked out. Prayers would be helpful." On August 23, 2023, LS sent ARCHIMEDE a text message in response asking when ARCHIMEDE would return the funds. In response, ARCHIMEDE sent LS a text message stating "ran into another glitch made another mistake so I'm trying to recover and get it done tomorrow so if it goes well I can have it back to you Friday I'm also putting the duplex up for sale[1] regardless if this goes through or not. I can have it sold in about 30 days. So your money is guaranteed by me one way or another."

---

[1] Based upon my review of commercially available and publicly available records, I learned ARCHIMEDE was previously the listed owner for a single-family residence located at 202 Randall Street, Waukesha, Wisconsin. Based upon my review of commercially available records, I learned that ARCHIMEDE sold this property to a third party for $225,000 on or about October 18, 2023. Based upon my review of ARCHIMEDE's personal banking statements, I observed that ARCHIMEDE received a wire transfer from a title company in the amount of $185,762,71 on October 18, 2023, and, on October 19, 2023, ARCHIMEDE transferred $90,000 to a Crypto.com account held in ARCHIMEDE's name and attempted to transfer another $90,000 to a Kraken account held in ARCHIMEDE's name. Based upon this information, I have reason to believe ARCHIMEDE did sell a piece of property shortly after telling LS that he would but then failed to remit the proceeds to LS. Instead, ARCHIMEDE

7

28.     LS contacted ARCHIMEDE again on October 6, 2023. According to LS, ARCHIMEDE apologized to LS and acknowledged the funds would not be returned to LS by the tax deadline. ARCHIMEDE told LS he had been using the money to invest in cryptocurrencies. ARCHIMEDE then suggested LS withdrawal more funds from LS' account to cover the tax penalties that would be incurred on the $52,000 withdrawal.

29.     LS contacted ARCHIMEDE on October 7, 2023, and demanded ARCHIMEDE sign a document stating how much ARCHIMEDE owed to LS with a date by which the funds would be returned.  Based upon my review of FINRA records, I learned that ARCHIMEDE signed a promissory note dated August 18, 2023, stating ARCHIMEDE borrowed $52,000 from LS and would pay back $65,000 to LS on November 2, 2023.

30.     On November 4, 2023, LS contacted ARCHIMEDE via text message to request an update on the status of the funds. In response, ARCHIMEDE sent LS a text message stating:

> "I'm waiting on a group of investors to finish the plan. Plan was supposed to be completed around first part of November there has been a delay but I'm told it will be done soon.  At that point I will pay you the money I owe you taxes you will incur in a little extra. I hope you can forgive me for all the heartache I have caused. To give you a little more background I'll try to keep this long story short as I can and help you understand. I saw cryptocurrencies to be very very profitable about 18 months ago since then I have been involved in several scams and I have lost about $800,000. This group I'm working with now fortunately it's not a scam they're even trying to help me recover some of the scam money I have lost.  I have sold my property and I've gained back a portion of my losses after the plan is done I can't say I'll be caught up but I'll be pretty close.  If I could offer a proposal because this plan is working very well I would like to pay you 10% a month on the amount that you loan to me. That would be $5,200 a month and I would still owe you the 52,000 after doing that. I would keep paying you $5,200 a month until the plan is over or you decide that's enough I want it back. I would still cover the taxes at tax time from that $52,000.? This way I can keep investing getting back my losses and pay you a pretty good profit on top of that. If you decide to go with the payment I will pay you 5200 after the plan is done and another 5200 at the end of the November.? Then each month after 5200. Whichever way you decide I'm completely okay with and I am so sorry for the heartache and grief I have caused. My intention was to have a vehicle that could help Bob get retired sooner than later."

31.     Based upon my review of documents provided by FINRA, I have learned ARCHIMEDE did not return the funds to LS.

---

used the proceeds from the sale to invest even further in the scheme that had led him to lose LS' money in the first place.

**ARCHIMEDE Received $65,500 from MM in November 2023**

32. On November 21, 2024, I conducted an interview of MM, who was a former investment client of ARCHIMEDE at Primerica. MM resides in the Southern District of Illinois.

33. Based upon my interview of MM, I learned that in November 2023, ARCHIMEDE used a position of trust to solicit MM to withdraw approximately $65,500 from MM's retirement accounts at Primerica so that MM could then lend those funds to ARCHIMEDE for investment in a cryptocurrency endeavor. According to MM, he was initially only going to "invest" approximately $30,000 with ARCHIMEDE. However, ARCHIMEDE told MM there had been an issue withdrawing the original amount from MM's account at Primerica, and ARCHIMEDE convinced MM to request another withdrawal of approximately $35,000. MM then gave the $65,000 to ARCHIMEDE, who in turn, converted most of the funds into cryptocurrencies, which he then transferred to currently unidentified third parties.

34. As part of my investigation, I received a copy of the text message correspondence between MM and ARCHIMEDE from MM. I observed that between October 30, 2023 and April 7, 2025, ARCHIMEDE communicated with MM to solicit and conceal the status of funds that MM had provided to ARCHIMEDE for "investment" purposes.

35. On or about October 30, 2023, ARCHIMEDE began contacting MM about the investment opportunity using phone number 262-309-5835. On October 30, 2023, ARCHIMEDE informed MM that Primerica would fire ARCHIMEDE if Primerica found out ARCHIMEDE was participating in an investment on the side because it involved using client money and because Primerica could not make money from the transaction. ARCHIMEDE instructed MM that if Primerica "ever calls and asks just say you have a remodel project or something".

36. Based upon my review of text message correspondence between ARCHIMEDE and MM, I have learned ARCHIMEDE asked MM to recruit additional investors into the scheme. On November 7, 2023, ARCHIMEDE sent a text message to MM stating, "You might know someone that wouldn't mind making some serious profits like you are going to. I could compensate you well for that." From my review of the text correspondence and my interview of MM, I learned that MM did attempt to recruit additional investors but was unsuccessful. In his communications with MM, ARCHIMEDE

9

referenced other investors and/or partners, as well as receiving other payments and investments, on multiple occasions.

37.     From on or about November 1, 2023, to on or about November 13, 2023, ARCHIMEDE regularly requested updates from MM regarding whether the funds had arrived in MM's bank account. On November 13, 2023, ARCHIMEDE sent MM a text message stating that MM's bank had contacted ARCHIMEDE to ask why MM had wired funds to ARCHIMEDE. ARCHIMEDE told MM that ARCHIMEDE had told MM's bank that the funds were a loan. ARCHIMEDE then told MM that ARCHIMEDE wanted to get their story straight because banks "don't like money being sent to cryptocurrencies because there's a lot of fraud out there." On November 13, 2023, ARCHIMEDE also sent MM a text telling MM that Primerica may contact MM about the withdrawal from MM's account and that ARCHIMEDE had told Primerica that MM was having some lawyer issues and needed money for that. Based upon my interview of MM and my current knowledge of the facts of the matter, ARCHIMEDE's assertion was false.

38.     On November 15, 2023, ARCHIMEDE sent MM a photograph of a handwritten note dated November 16, 2023. Based upon my review of the photograph, the note appeared to be signed by ARCHIMEDE and stipulated that ARCHIMEDE had received $65,500 in total from MM for the purpose of investing and the plan was to pay profits on a monthly basis until the plan was over or MM requested the investment back.

39.     I reviewed ARCHIMEDE's personal bank accounts and saw that ARCHIMEDE received a $33,000 wire transfer from MM on November 13, 2023, as well as $3,000 from TS, another potential victim, totaling $36,000. On the same day, $35,750 was transferred from ARCHIMEDE's personal banking account to ARCHIMEDE's Crypto.com account. Based upon my review of ARCHIMEDE's Crypto.com account records, I observed that on or about November 14, 2023, the $35,750 was converted to approximately 35,223 USDC, a cryptocurrency, and then transferred to USDC wallet address 0xbe6618cf9aa22cc631e162ed88366c4d54d8ecd6.

40.     Based upon my review of login activity for ARCHIMEDE's Crypto.com account, I learned that on November 14, 2023, only one device was used to access the account. According to the Crypto.com records, the name of the device used to access the account was "Mike's Galaxy A50" with

10

the application name "Android". Based upon my training and experience, the device name is usually pulled from the device itself, and the device's owner creates the device name with initially setting up the device for use. Based upon my training and experience, I also have reason to believe the term "Galaxy A50" refers to the make and model of the device, which is consistent with a Samsung Galaxy A50, a smartphone model produced by Samsung which uses the Android operating system.

41. I reviewed ARCHIMEDE's personal bank accounts and observed that ARCHIMEDE received another $32,500 wire transfer from MM on November 17, 2023. On the same day, $31,400 was transferred from ARCHIMEDE's personal banking account to ARCHIMEDE's Crypto.com account. Based upon my review of ARCHIMEDE's Crypto.com account records, I observed that on or about November 18, 2023, the $31,400 was converted to approximately $30,946 USDC, a cryptocurrency, and then transferred to USDC wallet address 0xbe6618cf9aa22cc631e162ed88366c4d54d8ecd6.

42. Again, I reviewed the login activity for ARCHIMEDE's Crypto.com account and observed that the only device that accessed the account on November 18, 2023, was "Mike's Galaxy A50."

43. On November 17, 2023, ARCHIMEDE sent MM a text message stating ARCHIMEDE had received the funds, it was now up to ARCHIMEDE and ARCHIMEDE's bank, and "all is good. Smoothe [sic] sailing now." On November 19, 2023, ARCHIMEDE sent MM a text message stating that a test deal would take place that day with a big deal coming up in approximately one week, and if all went well, ARCHIMEDE would be able to pay MM $6,500 on November 20, 2023. Furthermore, ARCHIMEDE told MM that for the big deal, ARCHIMEDE would pay MM the principal of MM's original investment plus an additional 30%, or $91,650 total.

44. On November 19, 2023, ARCHIMEDE asked MM to invest more money with ARCHIMEDE, despite the fact ARCHIMEDE had not returned any of MM's original investment. ARCHIMEDE instructed MM to "borrow, take another withdraw what ever [sic] you need to do." Furthermore, ARCHIMEDE asked MM if MM wanted ARCHIMEDE to send MM the profits from the first deal or add the profits to MM's investment for the "big deal". MM told ARCHIMEDE to add the

11

amount to MM's investment and pay it all out when the "big deal" was complete. ARCHIMEDE told MM to let ARCHIMEDE know if MM found more funds.

45.     During this conversation, ARCHIMEDE told MM that he was creating his own private equity firm called Eureka Private Equity. I have reviewed publicly available records from the Wisconsin Department of Financial Institutions and have not located a company actively registered with the State of Wisconsin using the name "Eureka Private Equity", "Eureka Investments", "Eureka Ventures", or any similar name containing "Eureka".

46.     On November 19, 2023, ARCHIMEDE sent MM a text message containing a screenshot (shown right) showing 270,000 USDC, a cryptocurrency, with text stating "Made some profits. Lol." Based upon my training and experience, I know USDC to be a stable coin which is designed to remain close in relative value to the U.S. Dollar, meaning the screenshot ARCHIMEDE shared with MM displayed a value of approximately $270,000 U.S. Dollars.



47.     On November 20, 2023, ARCHIMEDE sent MM a text message suggesting MM take out credit to invest more money with ARCHIMEDE. MM declined. On November 21, 2023, ARCHIMEDE sent MM a text message offering to guarantee 100% of MM's principal plus an additional 35% if there was a loss.

48.     On November 29, 2023, ARCHIMEDE sent MM a text message informing MM that the "big deal" had not started yet because the deal was waiting on ARCHIMEDE to bring in the last of ARCHIMEDE's outstanding money. ARCHIMEDE told MM that ARCHIMEDE had been experiencing more trouble with banks.

49.     On December 6, 2023, MM sent a text message to ARCHIMEDE requesting an update. In response, ARCHIMEDE told MM the trading would begin that night and ARCHIMEDE would show MM some results. On that same day, ARCHIMEDE sent MM a text message stating the first round had made 35%, the next round would wrap up on December 15, 2023, and after the next round was over, MM could take all, some, or none of MM's money. However, on December 14, 2023, ARCHIMEDE

12

sent MM a text message stating the trade had been delayed another week because someone had gotten $100,000 "stuck in the bank again."

50.     On December 14, 2023, ARCHIMEDE sent MM a text message asking MM if MM used Telegram. Based upon my interview of MM and my review of MM's subsequent correspondence with Archimede, I know MM downloaded the Telegram application, and the communications between ARCHIMEDE and MM later migrated from traditional text messaging over to the Telegram application.

51.     Based on my training, experience, and review of Telegram's website, I know that Telegram is a messaging app that claims to have over 1 billion active users. Telegram supports end-to-end encrypted messages, voice calls, video calls, and voice chats. With Telegram, users can send messages, photos, videos and files, create groups for up to 200,000 people, and create "channels" for broadcasting to unlimited services. [2]  From my review of Telegram's website, I have also learned the Telegram development team has historically been based in various foreign jurisdictions, including Berlin, London, and Singapore, but is currently based in Dubai, United Arab Emirates. Based upon my training and experience, I know the best way to obtain communications sent or received via the Telegram application is to access the messages on a participant's digital device.

52.     On December 22, 2023, MM sent ARCHIMEDE a text message asking if ARCHIMEDE was okay. In response, ARCHIMEDE told MM the trade was finishing up that weekend and things would be "good as gold." MM then sent ARCHIMEDE a text message informing ARCHIMEDE that Primerica had notified MM that Primerica had terminated ARCHIMEDE's employment. ARCHIMEDE told MM that ARCHIMEDE was still a representative for Primerica and that when ARCHIMEDE quit or was fired, he would have his own firm established. Based upon my review of records provided by FINRA, I know that while ARCHIMEDE did not resign from Primerica until on or about January 10, 2024, ARCHIMEDE had been suspended by Primerica since November

---

[2] Telegram's website explains that Telegram is a "messaging app with a focus on speed and security, it's super-fast, simple and free. You can use Telegram on all your devices at the same time — your messages sync seamlessly across any number of your phones, tablets or computers. Telegram is one of the top 5 most downloaded apps in the world with over 1 billion active users… With Telegram, you can send messages, photos, videos and files of any type (doc, zip, mp3, etc), as well as create groups for up to 200,000 people or channels for broadcasting to unlimited audiences. You can write to your phone contacts and find people by their usernames. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. In addition to this, we support end-to-end encrypted voice and video calls, as well as voice chats in groups for thousands of participants."

15, 2023 and on December 21, 2023 (one day prior to ARCHIMEDE's text message to MM), Primerica filed a Form U5 terminating ARCHIMEDE's registrations with Primerica, effectively removing ARCHIMEDE's authority to practice as a financial advisor.

53. On December 26, 2023, ARCHIMEDE sent MM a text message stating that the trades went well and ARCHIMEDE had added 29,000 to MM's account. ARCHIMEDE instructed MM to download the Telegram application. At this point in the correspondence, it appears MM complied with ARCHIMEDE's request because ARCHIMEDE and MM began communicating using the Telegram application.

54. MM provided me a copy of MM's Telegram messages with ARCHIMEDE. On January 5, 2024, ARCHIMEDE sent MM a purported account statement. However, due to the format in which the correspondence was provided, I was not able to read the statement. On January 9, 2024, MM responded by stating "Looks amazing!"

55. On January 21, 2024, MM requested another update via Telegram. In response, ARCHIMEDE sent MM a new purported account statement. Although I was not able to read the amounts in the statement, MM responded to the statement by stating "Spectacular!!!" On January 21, 2024, ARCHIMEDE told MM that the trading contained within the statements was from the "old platform" and the "new platform" should start soon. ARCHIMEDE told MM he had attempted a large withdrawal to pay people back but had encountered issues. ARCHIMEDE told MM the withdrawal was too large, and the platform had charged ARCHIMEDE a fee to break the withdrawal up into multiple withdrawals to "keep it under the radar for money laundering." ARCHIMEDE told MM, "the good news money is all there. Bad news it is stuck until I come up with the fee."

56. On February 6, 2024, ARCHIMEDE sent MM a text message stating that ARCHIMEDE had started using a new platform on February 5, 2024, that the new platform was "amazing," and once ARCHIMEDE paid the fee, MM "may never have to work again after a year." ARCHIMEDE then sent MM screenshots explaining how an Artificial Intelligence (AI) arbitrage trading system worked.

57. On February 20, 2024, ARCHIMEDE sent MM a text message requesting MM to recruit another individual into the investment scheme. MM informed ARCHIMEDE the individual had

declined to invest with ARCHIMEDE. In response, ARCHIMEDE told MM the potential was "so huge" and it was the individual's loss if they did not want to invest. MM told ARCHIMEDE the individual was employed as an investigator for a law firm. In response, ARCHIMEDE asked MM how he had met that individual.

58. On February 29, 2024, ARCHIMEDE sent MM a message via Telegram stating that ARCHIMEDE needed to raise $95,000 before ARCHIMEDE could invest the money again. ARCHIMEDE told MM that he had a handful of people he was contacting to help raise the $95,000.

59. On April 2, 2024, ARCHIMEDE told MM that ARCHIMEDE's account was frozen until ARCHIMEDE could come up with $350,000. ARCHIMEDE told MM that ARCHIMEDE was offering a 25% bonus for anyone who would help ARCHIMEDE pay the fee and ARCHIMEDE had opened a second trading account to help ARCHIMEDE reach the $350,000 faster. ARCHIMEDE also offered MM a 100% return, which would double MM's money on any amount of the fee MM helped with. MM told ARCHIMEDE that everything MM had left was his account at Primerica because MM's wife was not working. ARCHIMEDE responded by telling MM that when the investment was done, MM would have many more options.

60. On April 3, 2024, ARCHIMEDE offered MM a new type of account with which "money is easy in easy out." ARCHIMEDE told MM with the new type of account, MM would have a 60-day option to take money out and put it back with a 100% return.

61. On May 2, 2024, ARCHIMEDE sent MM another purported account statement dated April 1, 2024, via Telegram, which showed beginning and ending balances of $154,441 and a total deposit of $65,500.

62. On June 4, 2024, MM sent ARCHIMEDE a Telegram message requesting that ARCHIMEDE withdraw enough funds to cover the taxes due on the original withdrawal from MM's Primerica account by October 1, 2024. ARCHIMEDE told MM he was still working on the fee but would try to get the funds to MM sooner rather than later.

63. On June 11, 2024, MM informed ARCHIMEDE that MM had received a letter from authorities in Wisconsin requesting records of communications between ARCHIMEDE and MM. In response, ARCHIMEDE stated "I guess it looks like I am in trouble. I think they are looking for outside

15

securities violations. Selling of stocks and bonds outside of Primerica. I didn't do that. Borrowing money is against the rules not against the law. Not sure how to hand [sic] it at this point. Your [sic] not the first." ARCHIMEDE advised MM that "avoidance is best at the moment" and what MM did with MM's money was MM's business.

64. On July 22, 2024, MM requested an update from ARCHIMEDE. MM told ARCHIMEDE that interest was accruing on MM's tax liabilities and that MM needed to file and pay MM's taxes. In response, ARCHIMEDE told MM that ARCHIMEDE was working on a few things, that ARCHIMEDE was sorry, and that it was not supposed to be this way.

65. On September 9, 2024, MM requested an update from ARCHIMEDE. In response, ARCHIMEDE told MM that things were not going well and ARCHIMEDE was working very hard to get MM some money by the October tax deadline.

66. On October 9, 2024, MM requested an update from ARCHIMEDE. However, ARCHIMEDE did not respond. In fact, ARCHIMEDE did not contact MM again from October 9, 2024 to November 21, 2024—the date on which I interviewed MM.

67. ARCHIMEDE contacted MM again on April 7, 2025, to provide an update to MM and request that MM send ARCHIMEDE additional funds. In his text messages, ARCHIMEDE stated he had originally used a system called "Arbitrage" but had incurred a very large transactional fee which ARCHIMEDE was unable to pay back. ARCHIMEDE further stated the funds he had paid toward the fee were locked up and could not be used. ARCHIMEDE stated he had started a new successful platform but needed to reach a required amount of funds to continue to participate in the platform. ARCHIMEDE stated he had focused all of his efforts to make the investment work and had not paid a bill in two months and had not paid his taxes. ARCHIMEDE stated to MM that "any help in a finance department will make this much more successful. I do have guarantees on this platform not to lose money."

68. To date, ARCHIMEDE has failed to return any of MM's $65,500 investment, except for a $100 USD payment ARCHIMEDE transferred to MM's newly created Coinbase account in order to test the account's functionality.

16

**ARCHIMEDE Received $150,000 from JS and NS from 2023 to April 2024**

69. From December 2024 to January 2025, I conducted interviews of JS and NS, a married couple living in Sussex, Wisconsin, who were clients of Primerica. Archimede was their financial advisor.

70. JS and NS explained that they had known ARCHIMEDE for years and trusted him. They explained that sometime in 2023, ARCHIMEDE approached JS to "invest" with him in an opportunity outside of Primerica. JS estimated that JS' family had invested approximately $150,000 with ARCHIMEDE outside of their Primerica accounts from sometime in 2023 to in or around April 2024.

71. JS first "invested" approximately $40,000 with ARCHIMEDE in 2023. The first investment was funded by a withdrawal from a retirement account owned by JS and NS. From my review of ARCHIMEDE's personal banking records, I was unable to confirm a $40,000 from JS or NS to ARCHIMEDE. I did observe ARCHIMEDE deposited a $44,000 cashier's check on or about August 29, 2023 and a $41,000 cashier's check on September 6, 2023. Neither of those cashier's checks listed the names of the remitters, so I am currently unable to attribute those deposits to a particular victim. However, I was able to confirm ARCHIMEDE received an additional $116,200 from JS and JS' family between January 2024 and April 2024.

72. Like ARCHIMEDE and MM, ARCHIMEDE often communicated with JS via Telegram. JS provided me with copies of his communications with ARCHIMEDE on Telegram.

73. On March 24, 2024, ARCHIMEDE sent JS a statement of account titled "Eureka Private Equity March 2024 [JS]- Google Sheets.pdf."

74. On April 2, 2024, ARCHIMEDE sent JS a message stating ARCHIMEDE's account was frozen until ARCHIMEDE came up with the remaining fee of $350,000. ARCHIMEDE stated he had offered 25% bonus for anyone that helped ARCHIMEDE pay the fee. ARCHIMEDE also told JS that ARCHIMEDE had opened a second trading account to help him reach the $350,000 faster. ARCHIMEDE asked JS to give ARCHIMEDE additional funds and offered JS a 100% return, or doubling any money JS paid to help ARCHIMEDE pay the fee.

17

75. On April 2, 2024, ARCHIMEDE sent JS a message via Telegram stating that he planned to take care of JS and JS' family, but ARCHIMEDE needed to get over "this hurdle." ARCHIMEDE told JS that JS' family would have many options after ARCHIMEDE overcame the hurdle. Then ARCHIMEDE requested JS refer anyone "looking double their money" to ARCHIMEDE. ARCHIMEDE told JS that ARCHIMEDE was "literally loosing millions by not having this taken care of."

76. On April 3, 2024, ARCHIMEDE sent JS a message via Telegram stating that his new account was "easy in snd [sic] easy out." ARCHIMEDE stated his other account was the same until he tried to withdraw too much. ARCHIMEDE then asked JS if JS could take a loan on JS' 401(k) retirement account. ARCHIMEDE told JS that a 100% return was a huge opportunity, the money would not be locked up, and JS could have the money back any time. JS responded that JS had asked JS' Human Resources Department, which had informed JS that JS could not take a loan on JS' 401(k). ARCHIMEDE then suggested JS take out a loan on JS' 401(k) with the stated reason of paying off JS' truck but use the loan proceeds to invest with ARCHIMEDE instead.

77. On April 4, 2024, ARCHIMEDE sent JS a purported account statement via Telegram. The statement was dated March 1, 2024, and appeared to be issued by Eureka Private Equity— ARCHIMEDE's purported investment business. The purported account statement represented that the starting balance of JS' investment had been $49,200, and the investment's ending balance was $171,700. The statement appeared to show that the change in JS' investment was comprised of $95,000 of deposits and a bonus of $27,500.

78. On April 11, 2024, JS sent ARCHIMEDE a Telegram message asking if ARCHIMEDE could provide the balance on JS' account. ARCHIMEDE responded that he needed another day to get in front of his computer to put together the numbers. ARCHIMEDE told JS the money was "in and growing already."

79. That same day, JS sent ARCHIMEDE a Telegram message asking about the tax implications of the investment. ARCHIMEDE informed JS that JS would only be taxed on the gains after JS received all of JS' money back, and there would be no tax. JS then asked ARCHIMEDE about

the tax implications of leaving funds in the investment, to which ARCHIMEDE responded, "No tax until you get it in your hands" and "IRS has no way to track crypto."

80. On April 20, 2024, ARCHIMEDE sent JS a statement of account titled "Eureka Private Equity April 2024.pdf(1).PDF." In response, JS asked how ARCHIMEDE was doing with respect to money. ARCHIMEDE told JS that ARCHIMEDE was sitting at about $105,000 but hoped to reach $135,000 by the following Monday. When JS asked ARCHIMEDE if he had started trading, ARCHIMEDE responded "No trades yet. Btc halving is causing issued with blockchain and overcrowding".

81. ARCHIMEDE then sent JS one file titled "Eureka Private Equity April 2024.pdf(2).PDF," which contained two statements of account—one for each of JS' sons. Based upon my review of the statements of account, I have learned JS' sons invested $28,200 with ARCHIMEDE.

82. On April 23, 2024, ARCHIMEDE sent JS a message via Telegram stating that ARCHIMEDE was at $111,000 with an additional $25,000 coming in that day. ARCHIMEDE told JS that $35,000 of the $111,000 was trading profits. ARCHIMEDE told JS that ARCHIMEDE had only invested $80,000 and had withdrawn $4,100.

83. On April 24, 2024, ARCHIMEDE sent JS a Telegram message asking if JS had any success recruiting additional investors.

84. On April 26, 2024, ARCHIMEDE sent JS a Telegram message stating that ARCHIMEDE had received a call from Primerica asking about activities on NS' account. ARCHIMEDE told JS that ARCHIMEDE did not provide any answers to Primerica since NS was no longer ARCHIMEDE's client at Primerica, and Primerica had forgotten ARCHIMEDE had been fired. JS asked ARCHIMEDE what Primerica wanted to know. ARCHIMEDE told JS that Primerica did not provide any details in their message to ARCHIMEDE but ARCHIMEDE imagined it was related to the large withdrawal that was made from NS' account. ARCHIMEDE then stated, "I just thought I'd let you know just in case you wanted to come up with an answer if Rick should call or anyone else for that matter. Of course it's really none of their business." JS then asked ARCHIMEDE if JS was required to tell Primerica anything, and ARCHIMEDE responded that he was not. ARCHIMEDE told JS that

19

Primerica scrutinized large withdrawals made by clients under the age of 59 because FINRA was likely to investigate such a withdrawal.

85. On May 2, 2024, ARCHIMEDE sent JS another purported account statement from Eureka Private Equity dated April 1, 2024 via Telegram. The account statement represented that the starting balance of JS' investment had been $171,200, and the investment's ending balance was $183,300. The statement appeared to show that the change in JS' investment was comprised of $5,800 of deposits and a bonus of $5,800. The total deposit listed on the statement was $141,800.

86. On May 7, 2024, ARCHIMEDE sent JS a Telegram message stating that ARCHIMEDE just received a $30,000 commitment. ARCHIMEDE then asked JS if he had received any word from potential investors. On May 8, 2024, ARCHIMEDE sent JS a message stating that ARCHIMEDE was working really hard to find more investors.

87. On May 11, 2024, ARCHIMEDE sent JS a Telegram message stating that ARCHIMEDE had received $215,000. However, on May 17, 2024, ARCHIMEDE told JS that ARCHIMEDE still needed $155,000. ARCHIMEDE told JS that ARCHIMEDE had received $30,000 but had used those funds to pay some people.

88. As part of my investigation, I interviewed JS. JS informed me that ARCHIMEDE failed to return his investment and that JS and NS incurred significant taxes and penalties on the withdrawals from their retirement account. When JS and NS made their concerns about the taxes and penalties known to ARCHIMEDE, ARCHIMEDE told JS and NS that ARCHIMEDE would pay JS and NS back before the taxes and penalties became due and ARCHIMEDE would pay JS and NS back handsomely. ARCHIMEDE did not pay JS and NS back before the taxes and penalties were due, and JS and NS were left to either pay the amounts to the relevant tax authorities or be left with an outstanding tax debt. Even after ARCHIMEDE failed to return the funds in time to pay the taxes and penalties, ARCHIMEDE suggested JS and NS should claim they had been defrauded on their federal tax filings.

89. As previously mentioned, ARCHIMEDE issued statements to JS using the company name "Eureka Private Equity". Based upon my review of publicly available records from the Wisconsin Department of Financial Institutions, I have learned there was no company actively registered with the

20

State of Wisconsin using the name "Eureka Private Equity", "Eureka Investments", "Eureka Ventures", or any similar name containing "Eureka".

**ARCHIMEDE Submitted Complaints to the FBI Before August 2023**

90.　Upon conducting a search of the FBI's Internet Crime Complaint Center (IC3) database, I learned ARCHIMEDE submitted two IC3 complaints in which ARCHIMEDE claimed to be the victim of various cryptocurrency frauds. Based upon my review of these complaints, I have reason to believe ARCHIMEDE encountered similar cryptocurrency frauds prior to August 2023 and was aware that he was acting in furtherance of a fraudulent investment scheme from August 2023 through at least April 2025.

91.　On July 22, 2022, ARCHIMEDE submitted an IC3 complaint to the FBI. In the "Description of the Incident" section, ARCHIMEDE stated he sent money to two separate platforms, ATF and Simplex, using a Coinbase account. ARCHIMEDE claimed both platforms grew his money very fast, so he invested more money. ARCHIMEDE claimed that he was able to withdraw some of the funds, but when he tried to withdraw more money on or about July 1, 2022, the platforms would not allow him to withdraw any funds. The platforms told ARCHIMEDE that he was required to pay taxes on his profits and could not use money from the accounts to pay the taxes. ARCHIMEDE claimed he invested $343,450 with ATF and $98,000 with Simplex. ARCHIMEDE stated that he was introduced to ATF via a casual conversation on LinkedIn and Simplex via a casual conversation on WhatsApp.

92.　On May 13, 2023, ARCHIMEDE submitted a second IC3 complaint to the FBI. In the "Financial Transaction(s)" section of the form, ARCHIMEDE reported that on June 26, 2022, he lost $350,000 through accounts at Wells Fargo and Coinbase. In the "Description of the Incident" section, ARCHIMEDE appeared to report the same incident as he did in his July 22, 2022, but with additional detail. ARCHIMEDE described being the victim of multiple cryptocurrency frauds from May 2022 to August 2022. ARCHIMEDE claimed that he invested funds in fraudulent cryptocurrency platform accounts multiple times. When ARCHIMEDE attempted to withdraw the funds from the accounts, he was faced with large tax obligations. ARCHIMEDE said he reported the incident to the Waukesha County Sheriff's Office. However, ARCHIMEDE was informed by the Sheriff's Office that because

21

there was no present loss there the Sheriff's Office would not file ARCHIMEDE's complaint. In the IC3 complaint, ARCHIMEDE stated that he "asked them if I should pay the $96,000 in taxes so I could lose everything then file the report the police said yes that's the only way they would make a report after I paid the money then lose it." ARCHIMEDE said he paid the taxes but was not able to recover his investment.

93. It should be noted that both of ARCHIMEDE's IC3 complaints were submitted to the FBI prior to August 2023. Based upon the fact that ARCHIMEDE reported these matters to local law enforcement and the FBI, I have reason to believe ARCHIMEDE knew these incidents to be fraudulent. However, the circumstances described in ARCHIMEDE's IC3 complaints were remarkably similar to the circumstances ARCHIMEDE subsequently relayed to victims from August 2023 to April 2025.

**ARCHIMEDE Violated Primerica Company Policies**

94. Although violations of Primerica's company policies may not constitute or equate to violations of federal law, the existence of such policies demonstrate Primerica's efforts to protect its customers from inappropriate or illegal practices, and ARCHIMEDE's violations of those polices further illustrate ARCHIMEDE's state of mind during the alleged scheme. As previously shown, ARCHIMEDE's correspondence with victims indicated he was aware he was in violation of Primerica's policies and that such violations may even lead to termination of his employment. Despite this awareness, ARCHIMEDE showed disregard when he made statements like "Borrowing money is against the rules not against the law."

95. Based upon my review of a memo dated December 21, 2022 to "All U.S. Registered Representatives and Associated Persons of PFSI" from Securities Compliance at Primerica, I have learned Primerica employees were prohibited from conducting any securities-related business via text message. The memo further indicated "securities-related business" should be read very broadly to include any communication related to Primerica. The memo also informed recipients that text messages were discoverable in the context of customer complaints, arbitration, litigation, or regulatory investigations.

22

96. Based upon my review of a memo dated June 29, 2022 to "All Registered Representatives of PFS Investments, Inc." from Securities Compliance at Primerica, I have learned Primerica employees were required to disclose their involvement in various forms of cryptocurrency investments. For example, if an employee was devoting significant time or resources to trading cryptocurrency, then that employee may be engaged in an Outside Business Activity, and registered representatives were required to provide Primerica with prior written notice before engaging in any outside business activity or beginning any new employment. Representatives were advised by Primerica to exercise extreme caution when considering investing in any type of cryptocurrency or initial coin offering because cryptocurrencies were speculative investments and extremely volatile due to lack of regulation, oversight, and government backing. The memo further warned representatives of potential cryptocurrency-related frauds, stating "Remember, if the investment sounds too good to be true, it is probably a scam."

97. Based upon my review of ARCHIMEDE's correspondence with victims and FINRA records, I have learned ARCHIMEDE regularly communicated with his Primerica clients using text messages and did not disclose to Primerica his involvement in an outside cryptocurrency investment endeavor. In fact, as previously referenced in ARCHIMEDE's correspondence with MM on October 30, 2023, ARCHIMEDE knew his activities were in violation of Primerica's polices and that such violations would lead to his termination. However, rather than cease the inappropriate activities, ARCHIMEDE persisted and even increased the prohibited activities.

**Probable Cause to Search for Digital Devices**

98. As previously stated, I have learned ARCHIMEDE communicated with victims using text messaging, voice calls, and Telegram messages. Based upon my training and experience, I know that text messaging and Telegram messaging are generally conducted using a smartphone. Based upon my review of login records for ARCHIMEDE's Crypto.com account, I also have reason to believe ARCHIMEDE used a Samsung Galaxy A50 smartphone to access his Crypto.com account. However, I have also learned from Telegram's website that messages from the Telegram application can sync seamlessly across any number of an individual's phones, tablets, or computers.

23

99.     Based upon my review of FINRA records, I have learned Primerica did not purchase, lend, or otherwise provide electronic devices or equipment to its representatives. All Primerica representatives were independent contractors and conducted securities business using their own personal devices. Therefore, I have reason to believe the digital devices ARCHIMEDE used in furtherance of the fraud while he was employed with Primerica were likely the same digital devices he used in furtherance of the fraud after his resignation from Primerica. Furthermore, based upon my review of ARCHIMEDE's LinkedIn profile as recently as April 15, 2025, I know ARCHIMEDE continues to list 262-309-5835 as his phone number, which is the same phone number ARCHIMEDE used to make voice calls and send text messages to victims.

100.    I also know from my training and experience that smartphones are often backed up to remote cloud storage. Data from smartphones is often shared among a user's other digital devices via cloud accounts, and in the event a user replaces a digital device with a new one, cloud storage allows users to restore data from the old digital device onto the new digital device, thereby mitigating the risk of data loss when purchasing a new device. Therefore, I have reason to believe that any digital device used by ARCHIMEDE may contain evidence of fraud, even if that digital device was not specifically used to further the fraud.

101.    I have reason to believe ARCHIMEDE used a computer or tablet in furtherance of the fraudulent investment scheme. First, in his correspondence with JS, ARCHIMEDE mentions using a computer to calculate the balance of JS' account. Second, as previously stated, I know ARCHIMEDE transmitted computer-generated account statements to victims using the Telegram application. Based upon my review of some of these statements of account, I have learned the statements contained victim names, addresses, individual balances, and "Eureka Private Equity." Based upon my training and experience, the account statements appear to have been created using Google Sheets, which is a spreadsheet program that can be accessed from any device. However, based upon my training and experience, I know Google Sheets is often accessed using a computer or a tablet rather than a smartphone.

102.    I have reason to believe the digital devices sought in this affidavit can be found in the Subject Premises. As previously stated, Primerica did not issue ARCHIMEDE a separate device for

business purposes, and any devices used by ARCHIMEDE to communicate with his clients would have been ARCHIMEDE's own personal device. Additionally, ARCHIMEDE's use of "Mike's Galaxy A50" to access his cryptocurrency accounts indicates ARCHIMEDE was using a handheld digital device to further the fraud investment scheme, specifically a smartphone. I know, based on my training and experience, that individuals often carry smartphones on their person or store them in their residence. I also know, based on my training and experience, that individuals often leave or store old or obsolete devices at their residence. If my application for the requested warrant is approved, I intend to execute the search warrant while ARCHIMEDE is present inside the Subject Premises. Therefore, I have reason to believe at least one relevant digital device will be found on or near ARCHIMEDE's person inside the Subject Premises.

**<u>Probable Cause to Search for Records</u>**

103.    Based upon the information I have obtained thus far in my investigation, I have reason to believe ARCHIMEDE's personal residence, located at S41W26893 Oak Grove Lane, Waukesha, Wisconsin contains evidence of ARCHIMEDE's fraudulent activities. Based upon interviews of victims, and my review of ARCHIMEDE's personal bank records, I know ARCHIMEDE solicited and/or received funds from victims from at least August 2023 through at least April 7, 2025. As previously stated, I know ARCHIMEDE resigned from Primerica on January 10, 2024, meaning he no longer had access to Primerica's office, and after ARCHIMEDE resigned from Primerica, he stated to victims that he was starting his own company called Eureka Private Equity.

104.    Based upon my review of ARCHIMEDE's LinkedIn profile as recently as April 15, 2025, I have learned ARCHIMEDE listed himself as "self-employed" from February 2024 to the present. ARCHIMEDE's public LinkedIn profile claims that he can "show you how to navigate the financial struggles you face" and that he specializes "in helping business owners create stability and peace of mind." His profile claims, "give me 15 minutes on a phone or zoom call and I promise you, it will be the most important financial decision you will ever make."

105.    Based upon my training and experience, I know self-employed individuals often work from home. Additionally, I conducted Internet searches for ARCHIMEDE and Eureka Private Equity,

25

but I was not able to find an online presence or business location for either ARCHIMEDE or Eureka Private Equity (or any investment firm with "Eureka" in Waukesha, Wisconsin). As discussed above, ARCHIMEDE currently resides at the Subject Premises. There is no evidence that ARCHIMEDE has any other residence, place of employment, or interest in any other property that could serve as the business location for either ARCHIMEDE or Eureka Private Equity. Furthermore, as previously stated, company registration records available on the Wisconsin Department of Financial Institutions' website listed no company actively registered with the State of Wisconsin using the name "Eureka Private Equity", "Eureka Investments", "Eureka Ventures", or any similar name containing "Eureka". Therefore, I have reason to believe that if ARCHIMEDE was truthful when he told victims he was starting his own business, documents and records indicating the business exists will likely be found within his residence, and conversely, an absence of documents and records may provide evidence of material misstatements. There is no reason to believe that ARCHIMEDE is storing any of the items listed in Attachment B on any other premises.

106. Based on my training and experience, it is likely that a home office, especially when a business or businesses are operated from that home, would contain records and evidence of the operation or non-operation of said businesses. Evidence or records may include computers used in the operation of the businesses, business records (written and electronic) including bank statements and correspondence, accounting records to track income they earn and expenses they pay, legal process received or sent, notices and other correspondence from the Wisconsin Secretary of State or other state regulatory agencies, the IRS, the SEC, and/or FINRA, logs in various forms (written or electronic) related to mail or other correspondence received, and other similar records. Such records, or the absence of such records, constitute evidence of the operation or non-operation of Eureka Private Equity.

107. Based on my training, experience, and investigation to date, whether or not ARCHIMEDE is operating business from his home, there are likely records of his involvement with various fraudulent schemes at the Subject Premises, including victim lists and victim investment documents and records of financial accounts or transactions made between accounts.

26

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

108.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Subject Premises**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

109.     *Probable cause*.  I submit that if a computer or storage medium is found on the **Subject Premises**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this

27

evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, specifically statements of account provided to victims and statements made by ARCHIMEDE, I am aware that computer equipment was used to generate, store, and print documents used in the wire fraud scheme. There is reason to believe that there is a computer system currently located on the **Subject Premises**.

110. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Premises** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how"

28

of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer

29

user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

111. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to

30

ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

112. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

31

many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

113. *Place of examination*. It is my intention that all computers and electronic devices located during the execution of this search warrant will be removed from the scene and transported to an FBI forensic lab, which may be located in another district, to be imaged. I will request that the forensic lab complete imaging as soon as possible.

## UNLOCKING DEVICE(S) OR APPLICATIONS WITH BIOMETRIC FEATURES

114. The warrant I am applying for would permit law enforcement to compel certain individuals to unlock a device subject to seizure pursuant to this warrant using the device's biometric features. I seek this authority based on the following.

115. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many digital devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

116. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

117. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the

32

device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

118. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.

119. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

120. In my training and experience, users of digital devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

121. As discussed in this Affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

122. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled and that, instead, a passcode must be entered to unlock the device. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be

33

unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

123. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the location(s) described in Attachment A and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

124. Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Premises** and reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face to those same individuals and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of those same individuals and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

34

125.    The government would, if the cell phone is accessible/unlocked, seek to disable the mobile devices cellular data/Wi-Fi capabilities (i.e., airplane mode) before compelling the subject to utilize his biometric fingerprint to unlock any application within the device. The government may not be able to obtain the contents of the devices unless such biometric features are used to access the devices. Although I do not know which biometric features may be used to access any given device, I know based on my training and experience that it is common for people to use one of those features, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

<strong>CONCLUSION</strong>

126.    Based on the forgoing, your affiant respectfully requests that the Court issue the proposed search warrant as there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956-1957 (Money Laundering), and 18 U.S.C. §§ 371 or 1349 (Conspiracy) have occurred and that the evidence of these offenses, more fully described in Attachment B of this Application, are located in the **Subject Premises**, described further in Attachments A of this Application. Your affiant respectfully requests that this Court issue a search warrant for the **Subject Premises**, authorizing the seizure and search of the items described in Attachments B.

Respectfully submitted,

Blair R Diel

Blair Diel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on __May 16_____, 2025

_____
UNITED STATES MAGISTRATE JUDGE

35

**ATTACHMENT A**

**<u>Property to be Searched</u>**

The property to be searched is the premises, safes, and garage located at **S41W26893 Oak Grove Lane, Waukesha, Wisconsin 53189** (the SUBJECT PREMISES). The premises is a two-story single-family residence located on the east side of the intersection of River Road and Oak Grove Lane in Waukesha Wisconsin. The residence is gray or light blue with red shutters. The front door is located on the southwest side of the residence facing River Road. A two-car garage is located on the Northwest side of the residence with a driveway that opens onto Oak Grove Lane. At the end of the driveway is a mailbox labeled with "S41W26893 Oak Grove Lane". An above-ground swimming pool is located on the southeast side of the residence.



**ATTACHMENT B**

**Information to be seized by the Government**

1.      The items, information, and data to be seized from the location[s] described in Attachment A are fruits, evidence, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1343: Wire Fraud, 18 U.S.C. § 1956-1957: Money Laundering, and 18 U.S.C. § 371 (or U.S.C. § 1349): Conspiracy, as described in the search warrant affidavit, including, but not limited to:

a.    Records and information related to a financial fraud, cryptocurrency investment fraud or "pig butchering" scheme;

b.    Records or information related to the purchase, sale, possession, use, transfer, or exchange of cryptocurrencies, or the location, address, balance of any cryptocurrency assets or accounts;

c.    Passwords, private keys, or seed phrases associated with any cryptocurrency assets;

d.    Cryptocurrency wallets, to include digital wallets, cold storage wallets, paper wallets, or any other form of storing public and/or private keys associated with cryptocurrency assets;

e.    Records or information related to the creation or use of cryptocurrency accounts, wallets, or addresses;

f.    All documents listed financial transactions, communications, names, account numbers phone numbers, or other personal identifiers;

g.    Records and information related to the existence and/or operations of Eureka Private Equity or any other business owned or operated by Michael Jon Archimede;

h.    Records and information related to the identity or location of potential victims, witnesses, co-conspirators, or suspects involved in financial fraud schemes;

i.    Records and information related to communications with victims, potential victims, co-conspirators, and/or potential co-conspirators of financial fraud schemes;

j.    Records and information related to communications with legitimate cryptocurrency exchanges or other cryptocurrency companies;

k.    Records and information related to the Michael Jon Archimede's taxes, finances, and/or any movement of funds, to include data, records, images, documents, programs, applications, or materials tending to show the use of bank accounts, credit card accounts, or other financial accounts;

l.    Personal checks, cashier's checks, deposit slips, check stubs, wire transfer forms, promissory notes, or any other documents demonstrating a transfer of funds from victims or potential victims to Michael Jon Archimede or from Michael Jon Archimede to co-conspirators or potential co-conspirators involved in financial fraud schemes;

m. Records and information related to any administrative, civil, or criminal proceeding initiated by or against Michael Jon Archimede, to include any proceedings initiated by regulatory bodies such as the Securities and Exchange Commission, Financial Industry Regulatory Authority (FINRA), or any state agencies;

n. Evidence indicating Michael Jon Archimede's state of mind, or that of any potential co-conspirator, as it relates to the crime under investigation;

o. Digital devices or storage mediums used as a means to commit the violations described above, to include but not be limited to, a Samsung Galaxy A50 with device name "Mike's Galaxy A50", any computers or tablets located on the premises to be searched, and any digital device or storage media containing records relating to the creation of investor statements of account, the management of investor funds, or accessing cryptocurrency assets;

p. For any digital device or storage medium whose seizure is otherwise authorized by this warrant, and any digital device or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "Digital Device"), in addition to the items described in paragraphs a-o, above, the following items will be searched for and seized from these Digital Devices:

    i. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to financial fraud schemes;

    ii. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any money or funds obtained from any individuals or entities;

    iii. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any efforts to obtain money or funds from any individuals or entities;

    iv. All emails, texts, chats, other communications, documents, photos, videos and other items or information relating to any financial transactions, transfers, or deposits of funds, cryptocurrency, or purchases of assets or cryptocurrencies;

    v. Evidence of who used, owned, or controlled the Digital Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    vi. Evidence of software that would allow others to control the Digital Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    vii. Evidence of the lack of such malicious software;

    viii. Evidence indicating how and when the Digital Device was accessed or used to determine the chronological context of Digital Device access, use, and events relating to crime under investigation and to the Digital Device user;

    ix. Evidence indicating the Digital Device user's state of mind as it relates to the crime under investigation;

x. Evidence of the attachment to the Digital Device of other storage devices or similar containers for electronic evidence;

xi. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Digital Device;

xii. Evidence of the times the Digital Device was used;

xiii. Passwords, encryption keys, and other access devices that may be necessary to access the Digital Device;

xiv. Documentation and manuals that may be necessary to access the Digital Device or to conduct a forensic examination of the Digital Device;

xv. Records of or information about Internet Protocol addresses used by the Digital Device;

xvi. Records of or information about the Digital Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

xvii. Contextual information necessary to understand the evidence described in this attachment.

2. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of digital device or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3. The term "digital device" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6. During the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized to compel the display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) from Michael Jon Archimede at the time of the execution of the warrant, if necessary, to unlock any devices requiring such biometric

access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the devices, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

  a.  Any of the devices found at the Subject Premises or on the person of Michael Jon Archimede;

  b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments, for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

7.  While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any devices or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Devices, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.